# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**BRIAN FRENCH, DAVID FRENCH,
JEANNA FRENCH and
PAULA FRENCH VAN AKKEREN,**

                      Plaintiffs,

                                                          **Case No. 06-C-869**

        -vs-

**WACHOVIA BANK, NATIONAL ASSOCIATION,**

                      Defendant.

---

# DECISION AND ORDER

---

This diversity action relates to Wachovia Bank, National Association's ("WBNA")

actions as trustee for the James French trust.  French's children, the beneficiaries of the trust,

claim that WBNA breached its fiduciary duties by exchanging two whole life insurance

policies for two "no lapse" insurance policies through its affiliate, Wachovia Insurance

Services, Inc. ("WIS").  Plaintiffs seek to recover the lost cash value of the policies that were

surrendered, the profit made by WBNA and its affiliates, lost dividends and other fees.

WBNA moves for summary judgment.  Plaintiffs move for partial summary judgment

on their claim for disgorgement of $512,000 in commissions generated from the exchange.

For the reasons that follow, WBNA's motion is granted, and plaintiffs' motion is denied.[1]

---

[1] WBNA also moves to strike plaintiffs' jury demand.  In response to WBNA's motion for summary judgment, plaintiffs concede that they are pursuing claims on behalf of the trust.  D. 160, Ex. 1.  Therefore, the plaintiffs' claims are equitable claims, and their jury demand must be stricken.  Restatement (Second) of Trusts §§ 197, 198.

# BACKGROUND

James French founded J.L. French Company in 1968 in Sheboygan, Wisconsin. J.L. French specialized in small engine components, lawn care equipment parts and marine engine parts. The company also became one of the world's leading providers of engineered and assembled die-cast aluminum oil pans.

As part of his estate plan, Jim French executed two trusts in 1991 – Irrevocable Trust No. 1 ("Trust 1") and Irrevocable Trust No. 2 ("Trust 2") (collectively the Trust or the Trusts). Trust 1 holds a variety of investments, including insurance policies, and provides no distributions during Jim French's lifetime. Income from Trust 2 is distributed annually to Trust 1 and all trust assets are finally distributed to Trust 1 upon Jim French's death. After Jim French's death, Trust 1's assets are distributed equally among the beneficiaries. Before Jim French's death, the Trust cannot make any distributions to French or the beneficiaries. Both Trusts are irrevocable and cannot be altered or amended. The "rights and duties of the trustees and beneficiaries" are governed by Wisconsin law. Trust 1, Article VI; D. 141-1.

The plaintiffs in this case are the Trusts' beneficiaries – Jim French's four children – Brian, David, Paula (Van Akkeren) and Jeanna. Each worked in management positions at J.L. French. Each was gifted stock in the company by their father. By 1996, the French family members were the sole shareholders in the company. On April 2, 1996, J.L. French was sold for approximately $200 million. Jim French, individually and through his wife's estate, received more than $100 million. His children received more than $17 million each. None of the children have worked since the company was sold except Paula, who is an investment manager for a partnership among the children funded by their father in 2007 with

an additional gift of $80 million. By year end 2004, the approximate value of Trust 2 was $24 million, held principally in stocks and bonds, while Trust 1 held more than $5 million, not including the value of the insurance policies.

As grantor of an irrevocable trust, Jim French had no authority over that trust. Nevertheless, he exercised authority as the consensus spokesperson for the French family. Throughout 2004 and 2005, Jim French spoke for the beneficiaries when it came to the trusts he had established for their benefit. His children deferred to him on trust issues. Moreover, while Quarles & Brady were Jim French's attorneys, the firm was also counsel to the beneficiaries with respect to the trusts.

The issues in this case relate to WBNA's decision as trustee to procure insurance for the Trust through its affiliate Wachovia Insurance Services, Inc. ("WIS"). In a "1035 exchange,"[2] WBNA executed the exchange of two life insurance policies (a Pacific Life Insurance Company policy and a Prudential Life Insurance Company) for two John Hancock no lapse policies. The Pacific Life policy had a $5 million face value death benefit and an annual premium of $164,000. The Prudential policy was a second-to-die whole life policy with a $5 million death benefit. The premium on the Prudential policy was scheduled to increase more than $40,000 in order to maintain its $5 million death benefit. As of May 2005, the existing policies had a combined cash value[3] of approximately $2.2 million dollars. The cash values would have increased for several years. The new John Hancock policies

---

[2] An IRC Section 1035 exchange involves the swapping of policies through a tax-free exchange.

[3] Cash value, or cash surrender value, is the value a policy holder receives upon surrender or forfeiture of the policy. By forfeiting the policy, the insurance contract is canceled and the policyholder no longer has the right to receive, or have his policy beneficiary receive, the death benefit upon the policyholder's death.

have a guaranteed death benefit ($10 million combined) based on a level premium, but diminishing cash value that eventually becomes zero.

In 2004, the French family was looking to replace the Northern Trust Company as trustee. Based on Paula Van Akkeren's investment relationship with Gregg Weggeman of Wachovia Securities in Sheboygan, the family agreed to consider WBNA as trustee. Jim French interviewed WBNA Vice President Fred Church at French's home in Naples, Florida. Also present was Kathy Gray, an estate planning lawyer at Quarles & Brady and counsel to Jim French since the early 1990s. French indicated that he was looking to move his trusts based on Northern Trusts' poor investment performance. French requested that Church investigate the insurance policies held in Trust 1. French also made negative comments about the broker that sold those policies to the trust, Rick Swider. Swider apparently asked French to sign documents that he felt were "untoward." French is considered a "difficult client," one who keeps his own counsel and who seems afraid of being taken advantage of by professional advisors.

In late May 2004, Kathy Gray forwarded policy information to Fred Church. To perform the review, Church enlisted the help of Steve Schumacher, an insurance broker with WIS in Tampa, Florida. With the assistance of Gray, Schumacher was temporarily named power of attorney to obtain copies of in-force illustrations[4] on the two existing policies in the Trust. By the end of July, WBNA completed its review of the trusts and the insurance policies. On July 22, Church wrote to Gray confirming WBNA's willingness to act as

---

[4] An illustration shows an insurance policy's forecasted premium, death benefit, and cash surrender value performance over time.

successor trustee.  The letter went on to identify potential options for the insurance policies held in the Trust.  Specifically, Church introduced the notion that Jim French could lower premiums and receive guaranteed death benefits, pointing out, however, the condition that "the Trust is not dependent on the cash surrender value."

On August 3, 2004, Church flew to Milwaukee for a meeting with Wachovia Securities representatives and the Frenches.  The Frenches did not attend, but were represented by their attorneys at Quarles & Brady, Kathy Gray and John Bannen.  Bannen was very familiar with "no lapse" guarantee life insurance policies and had written and presented on the subject more than eight times in 2004 and 2005.  A no lapse guarantee policy is a universal life policy which guarantees that regardless of the balance in the policy cash value account, the contract will provide a promised death benefit so long as a specified premium is paid when due and other conditions are met.  By their very nature, no lapse policies are not designed to accumulate cash value and it would be a mistake to recommend no lapse policies to any potential insured that had an interest in maintaining or growing cash value in a life insurance policy, or if the Policy was not going to be kept until death.

Gray sent Jim French a memorandum from John Bannen summarizing the meeting.  Bannen's memorandum highlighted for French the principal disadvantages of no lapse insurance policies – specifically the diminished cash value and loss of flexibility.

> We discussed in a general way the limitations and restrictions on no lapse guarantees, but did not categorically conclude that in all cases they were inappropriate. . . . We discussed that such policies typically have poor or no cash values so that in the event that a policy is surrendered the owner of the policy loses more money than if a more traditionally funded policy was surrendered . . .

> Secondary guarantee policies are typically advantageous only when the policy is held until death. They are significantly less flexible in the event that for some reason that trust holding the policy wishes to surrender it, e.g., bond rates increase significantly and a better return can be earned on the bonds rather than the secondary guarantee policy.

Bannen described a no lapse guarantee policy as a "trade off" of flexibility for certainty. He further described the existing Prudential policy as "volatile," observing that the premiums would have to increase in the future to maintain the insurance.

The day before the August 3 meeting, Jim French told Gray he was upset that he wasn't informed about the meeting. In mid-September, still concerned about the August 3 meeting, French instructed Gray to cease work on the insurance analysis. Later in September, French and Gray excluded Weggeman and Wachovia Securities from involvement in Trusts 1 and 2 going forward. Fred Church received word that the insurance analysis was on hold, and he discontinued the project. Bannen also ceased work on the project during this time.

Despite Jim French's previous displeasure, the Frenches ultimately decided to move the trusts to WBNA. Nancy Davis, a senior trust officer at WBNA, was assigned to be the trust administrator. Church worked with Davis and Gray before year-end to document and transition the trusts to WBNA as successor trustee. The principal delay in transitioning the trusts was the result of back and forth negotiations between the Frenches and Northern Trust on the scope of Northern's release as prior trustee. The release issue was eventually resolved

and WBNA became trustee of Jim French's trusts, including Trusts 1 and 2, effective December 29, 2004.[5]

According to Church, Jim French called him in January 2005 asking to resume investigation of options on the insurance policies in Trust 1. French stated that he was looking for a "better deal" on the insurance in the form of either more insurance for the same premium or the same coverage for less premium. Church called Schumacher and set up a meeting with French. Schumacher requested illustrations on the existing policies. French denies that this conversation took place. Also according to Church, he and Schumacher met with Jim French in his Naples vacation home on January 20, 2005 to discuss insurance. French advised that he was interested in lower insurance premiums. French provided some May Clinic medical records and a signed HIPPA release. At the close of the meeting, Church advised French that if the purchase of new policies would proceed through WIS, a conflict waiver would be necessary.

After the meeting, French sat for a medical exam on February 8, with resulting forms bearing his signature. Using this information, Schumacher's group sent out requests for quotes from six insurers. John Hancock Life Insurance Company came back with the best rates.

Around March 1, 2005 French lawyers Gray and Bannen became active again in the process. On March 1 and 2, Bannen made calls to Schumacher and Church to discuss life insurance options. Five options were identified and discussed, among them:

---

[5] WBNA served as Trustee through 2007. The French family moved the trusts to M&I after commencing the instant lawsuit against WBNA.

- Cashing in.

- Less Premium – Same Insurance. Church noted: "If we selected this option (Less Premium) the cash value of the policies would be diminished. This would be a problem if the trustee wanted to elect to cash in the policies at a later date but I am unable to come up with a scenario where this would be necessary. The Trust has $30 million in other assets and the potential beneficiaries already have great wealth."

- Do nothing. Church opines: "If we choose to do nothing, the cash value of the policies would remain intact but I think that the need for it is outweighed by the fact that the face amount of the current policies is not guaranteed and that in the case of the Pru[dential] policy, the premium will almost certainly increase. Looking at the insurance policy as a fixed income substitute, interest rates would have to skyrocket during Mr. French's remaining lifetime for the trustee to focus on preserving the current cash value."

In March, Bannen discussed insurance issues with WBNA representatives at least six times. During this process, Bannen found WBNA to be responsive. WBNA provided him with the information he asked for. Church concluded that Bannen was providing the Frenches with a level of analysis and due diligence that they had not yet seen in other trust cases.

The culmination of Bannen's month-long review was his March 31, 2005 memorandum to Jim French. Bannen compared the Pacific and Prudential policies with the potential John Hancock replacement policies, showing the replacement policies' superior rates of return calculations and their diminishing impact on cash value over time. He highlighted and explained the recognized disadvantages of the no lapse guarantee John Hancock policies considered by WBNA, including poor cash values and inflexibility. Bannen and Jim French discussed this memo. Bannen found French to be engaged, attentive

and inquisitive on the subject of insurance policies. Moreover, Gray never had any reason to question French's competence. French wanted to monitor the situation and see the results of Bannen's review.

On March 31, Schumacher, Church, Bannen (by phone) and Jim French participated in a meeting about insurance. The March 31 Bannen memo was discussed. At the meeting, French agreed to take the John Hancock policy applications. After Bannen was off the phone and unbeknownst to Church, Schumacher presented French with 17 pages of insurance forms and instructed French to sign the forms in 15 places and to leave all questions blank. French took the blank forms with him and returned them signed on April 5 with the following note signed by French and his assistant: "To whom it may concern. All questions left blank per instructions from Fred Church and Steve Schumacher both employees at Wachovia. Forms were delivered to Wachovia Trust Departments' office secretary by Katie Clark, assistant to Mr. James French." Before the close of the meeting, Church again advised French of the need for a waiver, relating to Schumacher's commission, if the transaction proceeded.

French returned signed, blank Hancock policy application documents to Steven Schumacher under cover dated April 5. Schumacher's assistant then filled out and finalized the policy applications, using information he had gathered from Jim French. One Wachovia agent testified he could lose his license for filling out the information in a blank, signed application. Church testified this practice would not be allowed by Wachovia and Schumacher admitted it was a practice he would not recommend.

On April 12, the Managing Director for the Trust Department at WBNA, Ward Schaumberg, signed the application and the 1035 exchange forms. The quoted rates were

time sensitive, and the applications had to be submitted to prevent the expiration of the favorable John Hancock rates. Thereafter, Schumacher submitted the application and exchange forms, with instructions that the surrender of the old policies should be held until Mr. French's further approval. Schumacher wrote to John Hancock that "once the policies had been reviewed and approved by the client and the attorney, we will notify you in writing to begin the 1035 exchange process without further delay."

WIS and Schumacher made two mistakes when filling out the signed but blank applications: (1) a disability question was answered "N/A" and (2) a smoking question was not answered in one application. John Hancock required Mr. French's signature on an amendment that would properly answer these questions. WIS emailed John Hancock on May 12 to ask that its requirements be waived because "with regard to policy amendments, Steve has expressed that he does not wish to have Mr. French sign further documents." When John Hancock refused to waive the tobacco question, WIS again wrote to John Hancock: "I am of the impression that the rider document requires signature by 'applicant' who, in this case is the trustee. This is why we wanted to avoid disturbing Mr. French with the amendment (requiring both his and trustee signatures). I realize you have extended concessions 'over and above' and would ask if this could possibly be done." After telephone discussions with Schumacher, John Hancock agreed to waive the necessity of Mr. French signing the amendment.

The insurance discussions between the Frenches' attorneys and WBNA continued into April. The subject, however, was less about the analysis of the options and instead more about the commission to be earned on a future 1035 exchange. After Jim French turned in

the signed policy applications, Church sent Kathy Gray a proposed waiver of conflict of interest on April 7, 2005. Church's template waiver identified both the status of WIS as a WBNA affiliate and the fact that WIS would be receiving a commission directly on the contemplated exchange. Church's email labeled this a conflict of interest. Attorney Gray's time records indicate she received, reviewed and analyzed the waiver that day. Bannen expected that WIS would earn a commission on the proposed 1035 exchange and advised French of the same. Prior to any exchange, Gray also understood that there would be a commission.

When presented with Church's request for a waiver, Gray and Bannen considered asking for a rebate of the commission – a refund to the buyer, here Trust 1, of a portion of the insurance. Bannen explored the ability for WIS to rebate the commission and discussed it with Jim French. WBNA explained that it could not rebate the commission. French was displeased that WBNA would not rebate the commission, but this did not cause him to reject the transaction. The Frenches' attorneys next asked about the availability of trustee fee concessions in lieu of a rebate. Mr. Bannen had a conversation with Church about fee concessions, but Church provided legal authority that such an arrangement was prohibited.

Meanwhile, Schaumberg and Davis believed that they did not have sufficient insurance expertise to substantively evaluate the options identified by Church's March 4 email. In response, he had an independent evaluation of the options performed. Schaumberg referred the matter to WBNA's in-house expert, Robert Wannamacher. Wannamacher was employed by Wachovia as an Insurance Review Specialist in its ILIT (Irrevocable Life Insurance Trusts) department. Wannamacher was responsible for, among other things,

reviewing insurance policies held in ILITs. The goals of an ILIT are generally consistent with those of an irrevocable trust carrying life insurance – to maximize a guaranteed death benefit and reduce premiums.

On April 27, Jim French received a letter from Steve Schumacher advising that his new policies had been issued. Because of the hold placed by Schumacher, the Pacific and Prudential policies had not yet been surrendered and exchanged. John Hancock permitted the new policies to issue with the understanding that the Prudential and Pacific policies would be surrendered in the near future in order to fund the new Hancock policies.

On May 9, Schumacher had a conference call at 3:30 p.m. with Bannen and John Cahill from John Hancock. Bannen expressed concerns about the JH Policies and Cahill agreed to provide a letter addressing those concerns. Later the same day, Schumacher released the hold on the 1035 exchange, which set in motion the surrender of the Pacific and Prudential policies. Schumacher contends that during the May 9 call, Bannen finally approved the 1035 exchange. Bannen denies he ever gave such an approval or that he had the authority to approve. Schumacher further contends that this approval was repeated by both Bannen and Jim French on May 11. Bannen testified that he did not recall the May 9 and 11 telephone conferences.

Upon learning of the approval, Church resent his waiver request to Kathy Gray. French was angered by Church's request, refused to sign, and instructed his children also to do the same. Church requested a conference call with Bannen and Gray because "there are a couple of issues regarding the French trust that we would like to discuss." On May 18, before the conference call took place, Church wrote on behalf of WBNA to withdraw its

request for a waiver. "Our legal counsel has determined that after reviewing the facts and circumstances in this case, the Bank will not require the signing of any waivers by the beneficiaries of the French trust. Let me know if you still want to proceed with this afternoon's scheduled call." Schumacher's handwritten notes discuss the waiver: "I should have made you sign the waiver, shame on me. . . . We are perfectly comfortable with our recommendation – extreme amount of work by John Bannen. . . . we are in conflict – but comfortable with the situation based on the amount of due diligence. . . . I should have followed up – did not. You were presented at last minute, I understand you were upset."

On May 13, Schumacher's assistant wrote "has Hancock received the check? It needs to post today, if possible." She continued later the same day: "Please confirm that it will be applied to the policy today. This is for commission purposes only. Thank you." Schumacher wrote: "Please see note below. I am trying to make sure this gets paid this month. The target premium is $217,495 and more $ is coming via 1035 but I want to get paid on this $115,262 this month." When the first of the 1035 exchange funds were received on May 20, Schumacher received an email which stated: "Just received some good news on James French!" On May 27, the Prudential exchange check arrived: "Hi all! FYI the French 1035 from Pru has arrived!"

As a result of the 1035 exchange, WIS immediately received $512,000 in commissions and also received (and continues to receive) an additional 2% of annual premiums per year for the next nine years. This resulted in additional commissions for WIS in the amount of roughly $4,000 per year, for a total of $36,000 for the next 10 years

resulting in a total commission of approximately $548,000 paid to WIS. The amount of these commissions were not disclosed prior to the exchange.

On May 19, Gray wrote to Church advising him that Jim French was "concerned about the process that was undertaken to select the new policies" and was "very dissatisfied with the last minute difficulties, specifically the request for the waiver, release and indemnification that have occurred in connection with the insurance matters." French "expressed the view that since he is not the Trustee, he is not going to direct WBNA to do or not to do anything regarding the current status of insurance policies in Irrevocable Trust No. 1." Gray noted that French retained an insurance consultant to review whether "Wachovia is assessing any fees or other charges in connection with the insurance search which has taken place to date."

On May 27, the same day Schumacher received the 1035 exchange funds, a meeting was held between Jim French, Gray, Carl Westman (Mr. French's Florida attorney), Schumacher and Church. French was upset with how the waiver process was handled. He demanded copies of the completed applications and policies, a letter clarifying WIS' position on not requiring the waiver, a copy of the Pacific Life check with an accounting of the amount, a letter outlining the bank's recommendation on the insurance, an outline of fee charges and commissions, and a copy of the Prudential Life check when received.

On June 1, Schumacher wrote to each of the plaintiffs explaining how the written waiver was required but not received "due to our oversight." Schumacher explained that no additional fees or charges were incurred and that standard compensation was paid "from the carrier to the agency." He did not disclose the amount of commission. Schumacher assumed

that Bannen – with his extensive insurance experience – understood at least the approximate size of the commission.  Once Jim French actually asked for it, Schumacher provided the amount of WIS' commission on or about June 13.  Neither the French family nor their attorneys ever asked about the size of the commission during their extensive analysis.

On June 2, Schumacher wrote a letter to Jim French outlining his defense of the 1035 exchange.  The letter references telephone conversations with French and Bannen and states that "throughout the entire process, Bannen completed an extensive review of our analysis and provided thoughtful insight and due diligence."

Wachovia asserts that the 1035 exchange added at least $635,000 in value to the Trust.  Plaintiffs claim that the 1035 exchange caused the Trust to lose $846,000 in cash value.  Plaintiffs also claim that the John Hancock policies will have no cash value by 2018 if they remain in force and perform in a manner consistent with their initial illustrations.

The Frenches did not challenge the 1035 exchange until November 2005.  By that time, it was too late for the transaction to be reversed.  Schumacher and WIS would have forfeited their commission if the transaction was unwound.

## ANALYSIS

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*,

-15-

477 U.S. 317, 322 (1986). The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003). When confronted by cross-motions for summary judgment, "inferences are drawn in favor of the party against whom the motion under consideration was made." *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 500 (7th Cir. 2008).

## I.   Duty of Loyalty; Self-Dealing

The relationship between a trustee and the beneficiaries of a trust is a fiduciary relationship. The most fundamental duty owed by the trustee is the duty of loyalty. *Pegram v. Herdich*, 530 U.S. 211, 224 (2000) (citing 2A A. Scott & W. Fratcher, Trusts § 170, p. 311 (4th ed. 1987) and G. Bogert & G. Bogert, Law of Trusts and Trustees § 543 (rev. 2d ed. 1980)); *see also* Restatement (Second) of Trusts § 170. The Frenches claim that the 1035 exchange was a self-dealing transaction because it resulted in a $512,000 commission for WBNA's affiliate, WIS. "A consistent facet of a fiduciary duty is the constraint on the fiduciary's discretion to act in his own self-interest because by accepting the obligation of a fiduciary he consciously sets another's interests before his own."*Zastrow v. Journal Comm'n, Inc.*, 718 N.W.2d 51, 59 (Wis. 2006).

The rule of "undivided loyalty" requires that a trustee "must neither deal with trust property for the benefit of himself nor place himself in a position inconsistent with the interests of the trust." *In re Hanes*, 214 B.R. 786, 814 (Bankr. E.D. Va. 1997). The law "stops the inquiry when the relation is disclosed, and sets aside the transaction or refuses to

enforce it, at the instance of the party whom the fiduciary undertook to represent, without undertaking to deal with the question of abstract justice in the particular case." *Renz v. Beeman*, 589 F.2d 735, 744 (2d Cir. 1978). The principle is "one of prevention, not remedial justice, which operates however fair the transaction may have been – however free from taint of moral wrong." *Bank of Cal. v. Hoffman*, 38 N.W.2d 506, 509 (Wis. 1949) (describing law of agency). "Participation in a transaction that benefits oneself instead of another who is owed a fiduciary duty" is the "classic definition" of self-dealing. *Losee v. Marine Bank*, 703 N.W. 2d 751, 756 (Wis. Ct. App. 2005).

However, when the fiduciary is a trustee, the "tasks that the trustee is agreeing to undertake are set out in a trust agreement." *Zastrow* at 61. More specifically, the scope of the trustee's duties are defined by the trust instrument, which may in fact authorize self-dealing. "By the terms of the trust the trustee may be permitted to sell trust property to himself individually, or as trustee to purchase property from himself individually, or to lend himself money held by him in trust, or otherwise to deal with the trust property on his own account." *Welch v. Welch*, 290 N.W. 758, 782 (Wis. 1940) (quoting Restatement Trusts § 170, cmt. s); *Estate of Fruehauf v. Comm'r of Internal Revenue*, 427 F.2d 80, 86 (6th Cir. 1970) ("a fiduciary may be authorized by the terms of the instrument creating his powers to do that which in the absence of such provision would be a violation of his fiduciary duty of loyalty"); *Renz* at 744.

The French Trust provides that "[w]ithout limiting powers incidental to the purposes of the trust or otherwise existing by law, the trustee and all successors shall have, without approval of any court, the power . . . to continue as trustee and to deal with any trust

hereunder *without regard to conflicts of interest . . .*" D. 141-1, Trust 1, Art. III(B)(1) (emphasis added). Therefore, WBNA argues that it was authorized by the trust to execute the 1035 exchange "without regard" to the fact that the exchange would result in a large commission for its affiliate.

The Frenches argue that the phrase "continue as trustee and to deal with any trust hereunder" indicates that the Trustee can only ignore conflicts when dealing with "separate trusts" to be created upon the death of Jim French, not conflicts with the actual trust currently in existence. For the following reasons, the Frenches' interpretation of the Trust is untenable.

When settling the trust, Jim French expressed his intent that *"the series of trusts hereunder* continue perpetually absent the exercise of the power of appointment granted to each beneficiary of a *separate trust*." Article II(A) (Perpetual Existence) (emphases added). Upon French's death, the net assets of the trust are divided into equal shares for each of the beneficiaries. "Each share thus determined shall be administered as a separate trust *as provided in paragraph (D) for the benefit of the beneficiary to whom it is referable*." Article II(C) (emphasis added). In turn, Article II(D) deals with the administration of "separate trusts" for the beneficiaries. Elsewhere, the Trust explicitly references "separate trusts" administered under Article II(D). For example, Article III(A)(1) (Trustee; Appointment and Succession) provides that if "any successor [trustee] ceases to act after my death without having appointed a successor as provided above, the beneficiary of each *separate trust under Article II(D)* in which a vacancy in the independent trusteeship occurs, with a guardian acting for any minor beneficiary, shall appoint a successor independent trustee" (emphasis added).

-18-

Similarly, Article III(A)(2) provides that each "beneficiary of a separate trust under Article II(D) may, upon attaining age twenty-one (21), become a co-trustee of his or her separate trust by delivering notice to the independent trustee then in office."

By contrast, the "without regard to conflicts of interest" language does not reference "separate trusts" under Article II(D). In fact, the language is much broader, allowing the trustee to "continue as trustee and to deal with *any* trust hereunder," not just the "separate trusts" envisioned by Article II(D). *In re McGuire Marital Trust*, 660 N.W.2d 308, 313 (Wis. Ct. App. 2003) (Trusts, like wills, are interpreted to give effect to the settlor's intent, as determined by the unambiguous language of the instrument). The Frenches improperly focus on the word "continue," as if the trustee could only deal "without regard to conflicts of interest" when there was a transition to a "separate trust." For this interpretation to hold, the Court must interpret the term "hereunder" as referring only to separate trusts: "continue as trustee and to deal with *any trust hereunder*." But the term "hereunder" refers generally to something "later in this document" or in "accordance with this document." *Black's Law Dictionary* 732 (7th ed. 1999). Therefore, the phrase "any trust hereunder" refers to the trust established on the date of settlement in addition to any future trusts that might be created when Jim French dies. The trustee may continue as trustee, and need not resign, when conflicts of interest arise.[6]

---

[6] Moreover, if the term "hereunder" referred only to "separate trusts," many key provisions in the trust instrument would not apply to the trust as it currently exists. *See, e.g,* Article II(F) (Direction Against Assignments) ("The trusts created hereunder are for the personal protection and welfare of the beneficiaries. No beneficiary's interest in income or principal shall be subject to voluntary or involuntary alienation"); Article IV (Accounts) ("The trustee shall prepare at least annually an account of his administration of each trust established hereunder").

The Frenches are correct that the power to self-deal must be "specifically authorized in the instrument." *Praefke v. Am. Ent. Life Ins. Co.*, 655 N.W.2d 456, 459 (Wis. Ct. App. 2002). Language granting "authority to dispose of [property] in the same manner that the principal could do personally" does not equate to "an unrestricted power of disposition. . . . A far more detailed exculpation of the agent from a duty to account would be necessary to exonerate [the fiduciary] from the obligations imposed upon him by law." *Alexopoulos v. Dakouras*, 179 N.W.2d 836, 840 (Wis. 1970). As explained in *Praefke*, *Alexopoulos* stands for the proposition that a "general authority to deal with assets is not sufficient to exculpate [the fiduciary] from a charge of self-dealing." *Praefke* at 459 (citing *Alexopoulos*). In contrast to *Alexopoulos* and *Praefke*, the French trust grants far more than a "general authority to deal with assets." The general authority to invest assets is contained elsewhere in the trust, but the clause at issue specifically allows the trustee to deal "without regard to conflicts of interest." It is hard to imagine how the authorization to self-deal could be described more clearly. The authorization here is more akin to the one "intended to give to the trustees the broadest powers" in *Welch*, 290 N.W. at 782 (trustees may "individually, in good faith, sell any property to the trust estate, purchase any of the trust property from the trust estate or otherwise personally transact business with the trustees and the trust estate"); *compare Alexopoulos* at 840 (authorization to receive "for me and in my name, place and stead . . . all sums of money" owed to the principal and to "deal in any property" and to "transact . . . business of what nature and kind soever" does not allow self-dealing); *Praefke* at 459 (authorization to "do and perform everything for the purpose of . . . managing,

conveying . . . my property, real as well as personal . . . as fully as I could do and perform if personally present" does not allow self-dealing).

The Frenches further argue that self-dealing is precluded by the concluding, "catch-all" language in the "Powers and Duties" section of the Trust: "and in general, without limitation by reason of the foregoing," the trustee shall have the power "to do any and every act and thing that the trustee would have the right to do as trustee under applicable common and statutory law or as the absolute owner of property *provided that all powers shall be exercised exclusively in a fiduciary capacity*." Article III(B)(1) (emphasis added). The Frenches insist that this language unilaterally prohibits the trustee from engaging in a self-interested transaction. However, a trustee's fiduciary duty of loyalty "does not, in ordinary trust parlance, encompass every fiduciary duty." *Zastrow* at 66 (Abrahamson, C.J., concurring). Therefore, the direction to exercise powers "exclusively in a fiduciary capacity" does not necessarily refer to the duty of loyalty and the prohibition against self-dealing. *Id.* at n. 12-19 (listing other duties). It merely provides that the trustee must exercise its powers in a fiduciary capacity, whatever those fiduciary obligations may be in a particular situation. The specific authorization to self-deal controls over the general obligation to act as a fiduciary. *Isermann v. MBL Life Assur. Corp.*, 605 N.W.2d 210, 217 (Wis. Ct. App. 1999) ("Where there is an apparent conflict between a general and a specific provision, the latter controls"); *Woods v. Wells Fargo Bank Wyoming*, 90 P.3d 724, 736 (Wyo. 2004) (meaning

of a trust instrument is determined by the same rules that govern the interpretation of contracts).[7]

Finally, WBNA's pursuit of a conflict waiver prior to the exchange does not alter the foregoing analysis. WBNA was acting pursuant to its internal policies and procedures, but these guidelines merely represent the collective wisdom of good business practices. They obviously cannot trump the language in a trust instrument. To the extent that these generally applicable internal policies conflict with a specific trust relationship, the language of the trust controls. D. 142, Plaintiffs' Proposed Findings of Fact, ¶ 15 (no self-dealing "unless authorized by the governing instrument or applicable law"); ¶ 19 ("The bank will not purchase insurance products on behalf of a trust account through an affiliate unless specifically permitted by the governing instrument").

## II.    Good faith

Having found that WBNA was authorized to engage in a self-interested transaction, the Court must now analyze whether the transaction was executed in good faith. "A trustee's duty of loyalty can be reduced by means of language in the trust instrument permitting certain transactions involving self-interest. . . . Express language in the trust instrument or consent reduces the standard of duty to good faith and permits the court to weigh the merits of the transaction." *Hanes* at 814 (citing *Renz* at 744; *Matter of Balfe's Will*, 245 A.D. 22

---

[7]   The Frenches' attempt to construct a "drafter's intent" argument is rejected. D. 167, Affidavit of Kathleen Gray. Gray avers that the Trust was based on a Quarles & Brady form document, but she does not aver that she was the drafter of the instrument. Fed. R. Civ. P. 56(c)(4) (affidavit must be based on personal knowledge). In any event, extrinsic evidence of the drafter's intent is inadmissible where the language of the instrument is unambiguous. *Praefke* at 649; *Town Bank v. City Real Estate Dev't, LLC*, 793 N.W.2d 476, 484 (Wis. 2010) ("If the contract is unambiguous, our attempt to determine the parties' intent ends with the four corners of the contract, without consideration of extrinsic evidence").

(N.Y. App. Div. 1935)). "The trustee violates his duty to the beneficiary . . . if he acts in bad faith, no matter how broad may be the provisions of the terms of the trust in conferring power upon him to deal with the trust property on his own account." Restatement (Second) of Trusts § 170, cmt. t; *Welch* at 782.

The requirement to act in good faith is considered a "subsidiary element" of the fundamental duty of loyalty. *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). At least "three different categories of fiduciary behavior are candidates for the 'bad faith' pejorative label." *In re Walt Disney Co. Derivative Lit.*, 906 A.2d 27, 64 (Del. 2006). The first category involves "subjective bad faith," that is, "fiduciary conduct motivated by an actual intent to do harm." *Id.* In this sense, bad faith is "'not simply bad judgment or negligence,' but rather 'implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will.'" *McGowan v. Ferro*, 859 A.2d 1012, 1036 (Del. Ch. 2004) (quoting *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 n. 16 (Del. 1993)). The second category "involves lack of due care – that is, fiduciary action taken solely by reason of gross negligence and without any malevolent intent." *Disney*, 906 A.2d at 64.[8] The third category lies in between subjective bad faith and gross negligence – "intentional dereliction of duty, a conscious disregard for one's responsibilities." *Id.* at 66. In this sense, a "failure to act in good faith may be shown . . . where the fiduciary intentionally acts with

---

[8] However, the court in *Disney* explained that gross negligence, without more, cannot constitute bad faith under Delaware law in the context of corporate fiduciaries. "To adopt a definition that conflates the duty of care with the duty to act in good faith by making a violation of the former an automatic violation of the latter, would nullify those legislative protections and defeat the General Assembly's intent." *Disney*, 906 A.2d at 66.

a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient." *Id.* at 67 (quoting *In re Walt Disney Co. Derivative Lit.*, 907 A.2d 693, 755-56 (Del. Ch. 2005)).

It is readily apparent that WBNA's actions do not fit within the first two categories of bad faith. The Frenches may now lament the no lapse policies' lack of flexibility, but this does not mean that WBNA was grossly negligent or intentionally trying to harm the trust when it pursued and executed the 1035 exchange. To the contrary, WBNA engaged in a lengthy analysis of the transaction before executing the exchange. The Frenches present no evidence that WBNA was actively trying to harm the trust.

As for the third category ("intentional dereliction of duty, a conscious disregard for one's responsibilities"), it is undisputed that WBNA engaged in self-dealing. But simply because the 1035 exchange was a self-interested transaction does not preclude the possibility that it was undertaken in the best interests of the trust. *Cf. In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 231 (Bankr. W.D. Tex. 2008) ("Mere selfishness does not rise to the level of bad faith, . . . self-dealing and good faith are not mutually exclusive"). A fiduciary acts in bad faith only when he places his own interests *before* or *above* the welfare of those to whom he owes a fiduciary duty. *Disney*, 907 A.2d at 754.

The Frenches focus on the fact that WBNA initiated the concept of an insurance exchange. Even so, this was before WBNA was trustee, and the Frenches still moved the

trusts to WBNA. Once WBNA became trustee, the proposed transaction was analyzed and discussed over the course of an entire year. WBNA knew that WIS was in line for a commission, but so did the Frenches. The conflict was freely disclosed to French, the parties engaged in negotiations regarding the possibility of a rebate, and French was told on multiple occasions that the transaction could not proceed without a waiver. The Frenches chastise WBNA for the internal review by Brad Wannamacher because his background is with Irrevocable Life Insurance Trusts (ILITs), not irrevocable trusts like the French trust. This concern is overwrought because the goals of an irrevocable trust carrying life insurance are generally consistent with those of an ILIT. Finally, the dispute over whether the Frenches actually approved the transaction is not a material dispute. Approval is not required by the trust instrument. *Rock Springs Land and Timber, Inc. v. Lore*, 75 P.3d 614, 621 (Wyo. 2003) ("While a trustee may *sua sponte* seek the beneficiaries' agreement, unless the trust agreement so provides, their consent is not required"). The undisputed facts reflect that WBNA acted in the best interests of the trust, not that it pursued the exchange just for the commission.

The Frenches also argue that WBNA breached its fiduciary duties by failing to disclose the actual size of the commission until after the transaction was complete. *See* Restatement (Second) of Trusts § 170(2) ("The trustee in dealing with the beneficiary on the trustee's own account is under a duty to the beneficiary to deal fairly with him and to communicate to him all material facts in connection with the transaction which the trustee knows or should now"). However, since the entire premise of the exchange was the immediate loss of cash value in favor of lower premiums and a guaranteed death benefit, the

-25-

exact amount of the commission was not material to the transaction. The commission was simply paid by John Hancock out of the cash value of the old policies.

### III.  Prudent Investor Rule

The Uniform Prudent Investor Act[9] provides that a "fiduciary shall invest and manage assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the estate, trust, conservatorship, or guardianship. In satisfying this standard, the fiduciary shall exercise reasonable care, skill and caution." Wis. Stat. § 881.01(3)(a). "The test . . . is not whether, in hindsight, a more lucrative investment could have been made measured from the standpoint of safety, value, income, or tax consequences. Rather, the question is whether, *under the circumstances then prevailing*, a prudent man would have acted differently." *Ames*, 448 N.W.2d at 256 (emphasis in original); *Matter of Estate of Kugler*, 344 N.W.2d 160, 164 (Wis. 1984) (fiduciary must exercise the judgment and care that persons of prudence, discretion and intelligence exercise in the management of their own affairs); § 881.01(11). What a trustee did or did not do is a question of fact; what a reasonable trustee would have done in the same circumstances is a question of law. *Ames* at 255.

The Frenches now claim that they prefer the flexibility of accumulated cash value afforded by the former insurance policies. Hindsight preference aside, the trust already held approximately $30 million in other assets, so cash value justifiably seemed like a minor concern at the time of the exchange. The Frenches' own attorney recognized that no lapse

---

[9] WBNA argues that the prudent investor rule was eliminated by the language of the trust agreement, but the Court will presume that the prudent investor rule is applicable.

policies "ha[ve] a place in the diversified portfolio of a trust." "If purchased, it is unlikely that economic pressures would cause a surrender of the Hancock policy, i.e., there are sufficient other assets which should be sufficient to meet the needs of beneficiaries. . . . To the extent the policy diversifies and hedges the fixed income portion of the trust's portfolio the no lapse guarantee policy, subject to the limitation discussed above, would provide advantages to the trust." D. 150-4, John Bannen Memorandum, Section IV(A)(9)(i), (12), (13). The 1035 exchange was a prudent investment for the trust.

Perhaps more to the point, the Frenches have not even shown that the 1035 exchange harms the trust. The Frenches claim to want cash value, but if cash value is so important, it begs the question as to why the successor trustee has yet to redeem the cash value remaining in the John Hancock policies (approximately $1.5 million). The cash value of the policies will continue to diminish, but at the same time the trust is paying lower premiums, and the combined death benefit is guaranteed. The plaintiffs cannot make it seem like the no lapse policies were a poor investment through their desire or purported need to take the only action that would prevent the policies from maturing into a good investment. The "sole winning strategy is to keep the policy until death." Bannen Memorandum, Section IV(A)(9)(a). The current trustee apparently recognizes this and is acting accordingly.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1.      WBNA's motion to strike the plaintiffs' jury demand [D. 107] is **GRANTED**;

2.      Plaintiffs' motion for partial summary judgment [D. 136] is **DENIED**;

3.      WBNA's motion for summary judgment [D. 129] is **GRANTED**; and

4.      This matter is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 6th day of July, 2011.

**BY THE COURT:**

*s/ Rudolph T. Randa*
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**